*Decision will be entered under Rule 50.*

---

BOEING COMPANY, PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket No. 935–R. Filed January 10, 1962.

---

*Lowell P. Mickelwait, Esq., Andrew M. Williams, Esq.*, and *David E. Wagoner, Esq.*, for the petitioner.

*James H. Prentice, Esq., David L. Rose, Esq.*, and *Harland F. Leathers, Esq.*, for the respondent.

W꜠ITHEY, *Judge:* On December 5, 1955, the respondent issued its unilateral order determining that for the year 1952 petitioner had received excessive profits in the amount of $9,822,340 upon renegotiable business with the United States Air Force. At the close of the proofs herein, respondent, by an amendment of its answer to conform to such proof, now claims total excessive profits for 1952 in the amount of $20 million. The disposition of two preliminary issues is necessary in order to arrive at the total amount of petitioner's renegotiable profit for 1952. These issues are (1) whether certain advertising and other overhead expense is properly allocable to petitioner's renegotiable business and (2) whether the cost of work performed with respect to the design, development, and construction of a prototype airplane not in pursuance of any contract with the United States Government was properly allocable to renegotiable business. Depending upon the disposition of those issues, the parties have stipulated the amount of petitioner's renegotiable profit for 1952.

*Preliminary Issues.*

FINDINGS OF FACT.

All of the extensive stipulations of fact herein with respect to all issues are found as stipulated.

It has been stipulated and is accordingly found that during 1952 petitioner paid or incurred for overhead expense $581,530.93 which was properly chargeable as renegotiable cost for that year. This amount included amounts paid or incurred for advertisement in trade publications for the dissemination of technical information to the airframe industry, for catalogs and technical pamphlets designed to aid users of petitioner's products, for publications to aid in its personnel relationships and "help wanted" advertisement.

In addition to the above, petitioner paid or incurred during 1952 further total overhead expense in the amount of $629,755 of which it has on its books allocated to renegotiable cost the amount of $627,704. Of the amount of $629,755 so paid or incurred, $238,758 was for what petitioner designates "institutional" advertising, $80,000 was for entertainment expense, and approximately $311,000 was for selling expense.

Petitioner's method of bookkeeping, regularly employed and in accordance with which it prepared its Federal income tax returns, provided for an "overhead pool" where such items of overhead expense as could not be charged to a specific contract or work in progress were

accumulated. At the close of its fiscal year the expense items comprising the pool were allocated between renegotiable and nonrenegotiable business in direct proportion to the direct labor man-hours expended with respect to each.

"Institutional" advertising is typified by a newspaper advertisement of petitioner extolling the uses and virtues of an analog computer which Boeing is there claimed to have designed and developed. The advertisement is directed primarily to prospective purchasers of analog computers. Also typical of such advertising is a newspaper advertisement depicting a line of B-47 aircraft at Boeing's Wichita, Kansas, plant. The advertisement has as its primary objective the keeping of the Boeing name before the public and the instilling in the public mind of the fact that it was an efficient producer of an unusually complex aircraft. Likewise typical of such advertisement is a newspaper advertisement depicting a Boeing Stratocruiser in flight over the city of Paris, France. The primary objective of this advertisement is the keeping of the Boeing name before the public as producer of commercial aircraft.

The entertainment expense was in part related to the promotion of employee and community relationship and in part the purchase of meals and general entertainment of visitors and business associates.

Selling expenses were incurred or paid principally in connection with Boeing's commercial business.

No part of the above-mentioned $629,755 represents expenditures properly chargeable against the petitioner's renegotiable business for 1952.

In 1948 petitioner contracted to furnish the United States Air Force with B-47 jet bombers capable of altitudes and speeds at that time never before accomplished on a production basis by either bombardment or fighter aircraft. Later than 1948, but prior to 1952, it also developed a tanker aircraft designated the KC-97, which was propeller-driven, with internal combustion engines, and single low-wing design which was equipped with a refueling mechanism which also had been designed and developed by petitioner. The KC-97 had performance capability sufficient to refuel adequately in the air the most advanced bombers then used by the Air Force, the B-29 and the B-50 which was the improved B-29. When it became apparent to petitioner that the Air Force was to acquire and use the B-47 bomber as its primary deterrent weapon, it also became apparent that the KC-97 was not of sufficiently high performance to refuel adequately the B-47 in the air although it was true that by slowing the B-47's speed sufficiently, it was possible to make contact with a KC-97 and for the refueling process to take place. Refueling a B-47 at such low speeds and low altitudes posed undesirable military situations. Both aircraft while in the refueling process were traveling at such low

speeds and low altitudes that they were dangerously susceptible to enemy action. Boeing knew upon the advent of the B–47 that the Air Force had contracted for its construction largely because the basic design thereof contained hitherto unknown growth possibilities. The basic design of the B–47, for instance, permitted a range of approximately 1,500 miles. Before the completion of work under contract 21407 by the use of newly developed engines, rocket assisted takeoffs, and refueling in the air, this range had been extended to about 5,000 miles. It was reasonable for petitioner to conclude in 1952 that the B–47 had even greater growth potentiality were it to be refueled by a tanker with performance characteristics more nearly comparable to its own. Petitioner knew also that the Air Force intended to make full use of the growth potentialities of the B–47.

Petitioner also believed, and it was the consensus of opinion of airframe manufacturers in this country, that jet-powered commercial airliners would be in demand within a reasonably foreseeable future. Petitioner attempted on several occasions prior to 1952 to obtain a contract from the Air Force for the construction of a jet-powered tanker. Representatives of the Air Force, although interested in such a tanker, indicated that they had no congressional appropriation therefor, no program therefor, and as a result refused so to contract. In 1952 petitioner's management was sufficiently certain of an eventual Air Force contract for such tankers and of a prospective commercial market for jet-powered transport aircraft that without a military or commercial contract therefor they proceeded to design, develop, and partially construct what was designated on its books the model 367–80 prototype. During 1952 petitioner expended $1,734,302 in this process. This work occurred in a walled-off area of the Government's plant at Renton, Washington, for which petitioner was charged and paid rental. On its books the amount so expended was charged as an expense to profit and loss during 1952. The preliminary engineering and development work began in April of that year and construction of the prototype began in the latter part of that year. About 83 percent of the amount expended in 1952 was for engineering and development work and the remaining 17 percent was for tooling and production. In producing the prototype, petitioner's management instructed its employees that where problems arose as between the commercial or military concept of the prototype, the military concept was to prevail. The airplane was constructed and first flown in 1954 and was still flying and in use by petitioner as a "test bed" as of the date of the trial hereof, in October 1958. The prototype was used to try out and test new ideas developed by petitioner and to demonstrate its commercial and military possibilities to prospective customers. It is still in use for that purpose.

The airplane was the prototype of Boeing models 707 and 720–B jet

aircraft and the model KC–135 jet tanker subsequently sold in substantial numbers to the commercial airlines and the Air Force of the United States, respectively.

Boeing's construction of the prototype was without a contract with the Air Force or any commercial customer and no part of its expenses in the construction therefor was paid for by either. All such expenses were defrayed from Boeing's funds. Boeing's determination to construct the prototype in 1952 with its own funds and without contract resulted in the availability of the KC–135 tanker to the Strategic Air Command of this country 2 years prior to the time it would have been available had Boeing awaited an Air Force contract. The availability of the KC–135 constituted and effectuated a significant advance in the military utility of the B–47 and the B–52 bombers of the Strategic Air Command.

Upon three prior occasions petitioner had constructed prototype aircraft without Government or other contract therefor and had upon each occasion treated them upon its books as capital assets.

In July 1952, in response to a request by petitioner, the Deputy Commissioner of Internal Revenue, by letter, granted petitioner permission to change its accounting method with respect to prototype 367–80 so that the cost thereof might be expensed by petitioner rather than capitalized as had been its method prior thereto. The request was made upon the grounds, as petitioner stated, of its uncertainty whether income would ever be realized from the prototype and that it had no certainty of an ultimate purchaser or of a future market or demand for the model airplane of which 367–80 was a prototype. The permission granting the right was based upon the same grounds.

The model 367–80 prototype when constructed had a useful life of 25 years and a value of not less than $4 million.

The expenditure of $1,734,302 by petitioner in 1952 with respect to the engineering, development, and construction of the model 367–80 prototype was for the creation of a capital asset. Such expenses do not constitute reimbursable costs with respect to the renegotiable sales and profits of petitioner for 1952.

OPINION.

Petitioner, in claiming allocability of the advertising, entertainment, and selling expenses set forth in our findings, relies almost entirely upon the general provisions of section 103(f) of the Renegotiation Act of 1951 and the regulations of the respondent thereunder dealing generally with the allocability of costs. Both that section of the Act and section 1459.1 of respondent's regulations provide generally that where the contractor maintains a cost accounting system which properly reflects renegotiable costs, the costs there shown will be allocated in accordance with that method to renegotiable

receipts. However, with respect to selling and advertising expense, the former of which would include the entertainment expense involved herein, section 1459.7 of the regulations is specific. Subsection (a) (1) thereof is as follows:

> (a) *Selling.*—(1) Selling expense will be allocated to renegotiable business only to the extent that (i) it relates in major part to technical, consulting and other services performed in connection with the application and adaptation of products comprising the renegotiable business to the uses and requirements of the Government or other contractors; or (ii) it relates to the maintenance of offices or agencies engaged in the servicing of products comprising the renegotiable business; or (iii) it relates to the sale of products or services comprising the renegotiable business which are of the type ordinarily sold or rendered by the contractor and which are sold or rendered through the distribution system normally used by the contractor; or (iv) it is a commission of the type allowed in section 1459.2(c).

Subsection (b) (1) is as follows:

> (b) *Advertising.*—(1) Items of advertising expense comprising "help wanted" advertising, advertising in trade publications which are primarily directed to the dissemination of technical information within the contractor's industry, catalogues and technical pamphlets designed to aid users of the contractor's products, and house organs and other publications directed to labor and personnel management and relations, are recognized as costs allocable to renegotiable business. The aggregate of such costs will be allocated in accordance with the method of accounting found by the Board to be acceptable under section 1459.1(b) of this subchapter.

Subsection (b) (2) (ii) thereof is as follows:

> (b) *Advertising.*—* * *
> (2) Other advertising expense is allocable to renegotiable business as follows:
>       *       *       *       *       *       *       *
> (ii) In cases in which it can be demonstrated that a prime contractor or subcontractor engaged in renegotiable business to the detriment of its normal commercial business in the year under review, and thereby incurred the risk of loss of its competitive position in the industry concerned, the Board will allocate to renegotiable business that portion of the prime contractor's or subcontractor's normal advertising expense which the Board deems properly attributable to the effort by the prime contractor or subcontractor to forestall such loss of competitive position.

We are unable to find from this record that petitioner's disputed advertising expense falls within any of the categories of such expense set forth in subsection (b) above quoted and have found as a fact that it was here paid or incurred with respect to its commercial business or to maintain its name before the public as a producer of commercial aircraft. No evidence has been introduced to establish that any of such advertising had the effect of recruiting employees, raising or maintaining the morale of its employees, or of recruiting suppliers. It is apparent that under the stipulation of the parties petitioner has received adequate allowance of such expense as renegotiable cost.

We are likewise unable to find from the record that the disputed

selling expense falls within the provisions of subsection (a) (1) above quoted and have found as a fact that such expense related to petitioner's commercial business. As in the advertising issue, we note that adequate allowance has been made in the stipulation for such expense as a charge against renegotiable receipts.

On this issue we find for the respondent.

Relying on section 103(f) of the Renegotiation Act and the provisions of sections 1459.1(b) (3) and 1459.8(e) (3) of the respondent's regulations under the Act, the petitioner contends that its expenditures of $1,734,302 during 1952 with respect to the 367–80 prototype airplane constitute experimental and developmental costs incurred and paid by it during that year in the operation of its experimental and development division and as such the allocable portion thereof based upon a comparison of direct labor hours expended on renegotiable and nonrenegotiable business, or $1,731,283, is chargeable as renegotiable cost herein. The petitioner makes this contention despite the fact that the expenditures were not made in the performance of a contract with any agency of the United States Government.

Respondent contends, on the contrary, that the expenditures do not constitute experimental or developmental expenses within the meaning of either the portion of the Renegotiation Act or the provisions of the respondent's regulations thereunder relied on by petitioner but are in reality expenditures for the acquisition of a capital asset which is not chargeable renegotiable cost.

The portion of the Renegotiation Act and the provisions of the respondent's regulations relied on by petitioner in support of its position are not here applicable, and no part of the expenditures is allocable to renegotiable business if the expenditures were made for the acquisition of a capital asset.

In support of its contention petitioner likens the expenditures here involved to those which are incurred in the operation of an experimental laboratory. Inasmuch as petitioner's president in his testimony herein repeatedly stated that the prototype was a "test bed," we think the simile is proper but in a different respect. While it is clear that laboratory expenses for fuel, expendable test tubes, chemicals, salaries and wages, and general overhead are properly to be regarded as the expense of operation of an experimental laboratory, no one could properly claim that the cost of construction of the laboratory itself is overhead expense. The laboratory has a utility beyond a single year; it has a determinable value and may be put to use in other fields of business than that of its owner. We not only liken the prototype here involved to an experimental laboratory but to one of the tools of a laboratory such as one owned by petitioner, i.e., its wind tunnel. There is no evidence here that petitioner has attempted to reduce its 1952 receipts by amounts expended for the construction

of its wind tunnel. The wind tunnel like the prototype is an experimental tool or test part, with a useful life greater than 1 year and value of its own.

We are not impressed either with petitioner's contention that there was no certainty when the prototype's construction was begun in 1952 that it would ever be completed or that it would ever derive income as a result of its use or that there was a market for the model of which it was a prototype. The word "certainty" as petitioner uses it has a broad philosophical connotation and, of course, in that sense there is considerable authority for the philosophical proposition that literally nothing is certain except death and taxes. As used by this and other courts, however, in the context hereof the word means reasonably certain from a business standpoint, that is, an assurance based upon existing factors which lead in the normal course of business to an expected result. *Hart-Bartlett-Sturtevant Grain Co.*, 12 T.C. 760. In view of its loss with respect to a prior prototype, we do not believe that petitioner would have so endangered its comparatively small net worth as to enter upon the construction of a multimillion dollar prototype airplane without a reasonable business assurance that the prototype would be completed and that there would be a reasonably assured and profitable future market for the models of which it was a prototype. We are convinced that from a business standpoint petitioner took a calculated risk with respect to a future market but that such risk was no more than that which is to be expected in the ordinary conduct of any business. The prototype has all of the attributes of a capital asset, and we find that it was one and that the costs pertinent to its engineering, designing, and construction incurred and paid by petitioner during 1952 cannot therefore be properly allocated to renegotiable business.

In accordance with the stipulation of the parties we therefore find that petitioner's renegotiable profit for 1952 was $56,734,119.

### Reasonableness or Excessiveness of Profit.

#### FINDINGS OF FACT.

Petitioner is a Delaware corporation, organized in 1934, and at all times material herein had its headquarters and principal place of business in Seattle, Washington. With few exceptions its business has always been the manufacture of airframes. To and through the year 1952 about 99 percent of its production has been that of airframes for the military services of this country. Airframes consist of the fuselage, wings, landing gear, and control surfaces of an airplane. All of its Government production has been performed under contract with one or another of the military services. To a large de-

gree such contracts have resulted from demonstrations of petitioner's products and designs in competition with those of other members of the airframe industry. Generally, the airframe industry is marked by unusually intense competition due largely to the fact that it is comparatively new and, since the close of World War II, has experienced an extremely rapid advancement and growth in the art of the design of aircraft. Throughout its existence petitioner has never experienced normal business as that term is generally understood. When performing under Government contracts, it has consistently produced an article of high unit cost, its volume being low in comparison to manufacturers generally. Its profits have been, in one form or another, based upon its cost of production and have been correspondingly high in amount. However, the contracts have always contained a provision that they might be terminated by the Government without notice. In petitioner's experience such contracts have upon occasion been so terminated leaving petitioner's plants, equipment, and personnel suddenly idle. In fact, whether petitioner was working to capacity or completely idle has been almost entirely governed by the exigencies of international politics and the safety or danger to the United States engendered thereby. Its business has always been characterized by peaks and valleys and abnormality rather than normalcy. Compared to the total sums involved in petitioner's production under Government contracts, its investment in fixed business assets has been and was in 1952 small. Its successes in obtaining contracts with the Government have been primarily due to the experience, know-how, and skill of its employees both direct labor and general administrative, supervisory, and especially its design engineering staff. Its attempt, prior to 1952, to break into the civilian aircraft field was at financial loss but was nevertheless undertaken for the purpose of maintaining in its employ a core of experienced and skilled personnel so that the integrity of its overall know-how would remain intact. This attempt was the result of the sudden termination of large Government contracts subsequent to the close of hostilities at the close of World War II.

During and subsequent to World War II petitioner manufactured B-29 heavy bombardment aircraft under contract with the United States Air Force. During World War II, as the result of winning a design competition carried on under Air Force auspices, its design was chosen as that which was to be the medium bombardment aircraft for the use of the Strategic Air Command, and petitioner was chosen as the design prime contractor for the manufacture thereof. The bomber so chosen was designated the B-47.

The B-47 was chosen by the Air Force partly because of the great advancement it represented in the art of bomber design but largely

because of the growth possibilities inherent therein. It was the first sweptwing, jet-powered bomber ever constructed. Its performance was far superior to the best performing bombardment aircraft theretofore manufactured, its service altitude being 45,000 feet as compared to the previous limit of 35,000 feet and its speed, exceeding 600 miles per hour, represented an advancement over former bomber speeds of about 300 miles per hour and altitudes of 10,000 feet. Its wing-type, although having been used by the Germans in World War II in fighter aircraft in comparatively crude form, was an innovation in the construction of bombing aircraft. The wings were sweptback, very thin for the weight of the B–47, with a high aspect ratio, and contained six jet engines in pods protruding forward and below the leading edge of the wing. Whereas the wing covering of previous bombers, although metal, was not designed to carry much, if any, of the wing-loading, that of the B–47 was of metal and was designed to bear a substantial part of that weight. The wing covering tapered consistently from a thickness of five-eighths inch at the root to three-sixteenths inch at the tip. As manufactured by petitioner the plane was equipped with its landing wheels placed in tandem rather than side by side and at the nose. To aid in reducing its approach speed and its landing run, it contained a "drogue" parachute in a tail compartment which could be opened by the crew while in flight. Although the B–47, as experimentally constructed, was equipped with conventional ailerons, these were found to reverse their function at very high speed due to the bending and twisting upwards of the outer portion of each wing upon which they were located. To correct this effect, petitioner installed spoilers upon each wing which made it possible to counteract the reversing effect by interference with the smooth flow of air over the wing, thus causing that wing to lose its lift and lower. The bending and twisting effect was also counteracted by the placement of the engines as above described. The plane, due to its radical wing design, as experimentally built, was deficient in its lateral control at approach and landing speeds. As manufactured, petitioner designed and installed wing flaps at the inner portion of each wing. These could be extended from the trailing edge of the wing to increase its lift at low speed and could be used as supplements to the ailerons to increase low speed lateral control. The wings also contained the plumbing for the injection of water into its engines. To aid in its takeoff, the B–47 was equipped with rocket-type thrust in the form of multiple "Jato Bottles."

As finally manufactured in 1952, the B–47 was the densest bombardment aircraft ever produced. Density is the degree of inside space which is occupied by the equipment necessary to its operation as an airplane and as a weapon. As experimentally designed and built,

when accepted by the Air Force, the gross weight of the B-47 was 120,000 pounds. In 1952 its gross weight had advanced to 220,000 pounds. Gross weight is the number of pounds of weight represented by the aircraft itself, its fuel load, its crew, bombs, and weapons which it is capable of lifting on takeoff. Gross weight has a direct bearing upon its value as a weapon in that the more fuel lifted along with its full load of bombs the greater its range of operation.

In 1952 the B-47, in accordance with contract specifications, was to have installed, together with water injection, a bomb-navigation system necessary for the successful delivery of its bomb load and a system of defensive armament control. Each of these systems was of such advanced design that the subcontractors who manufactured and designed them had not, during 1952, completely developed them. Each of them was equipment, the furnishing of which was the responsibility of the Air Force. Because of the late development and delivery to petitioner of these systems, they or one of them were not installed in some of the B-47's delivered by petitioner and accepted by the Air Force in 1952. Such B-47's were listed as "deficient."

Because there is a limit to the fuel load which an airplane can lift, its range, as before stated, is thereby limited. The Air Force in 1946 requested petitioner to design a mechanism which would permit the rapid transfer of fuel from a tanker airplane to a bomber while in flight. Petitioner designed and constructed such a mechanism and installed it in a C-97 cargo plane which thereby, after being equipped with the necessary tank capacity, became the KC-97 tanker airplane after its acceptance by the Air Force. These planes were propeller-driven and had sufficient speed so that fuel could be transferred from them to a B-47 provided the latter reduced its speed and altitude to conform to that of the former.

A B-52 is a bombardment aircraft of the same basic configuration as the B-47 with the exception that it is considerably larger. Its gross weight is more than double that attained by the B-47. Its performance capabilities exceed those of a B-47 to about the same degree as the B-47 exceeded those of its predecessor, the B-50 propeller-driven bomber. The Air Force in 1947 contracted with the petitioner for the design and construction of two experimental models of the B-52. In 1952 it successfully designed and built two such aircraft. Because of petitioner's experience with the B-47, it was discovered that metal wing surfacing with the consistent taper used on the B-47 was not of proper design to permit the full attainment of the B-52's performance and growth capabilities. To correct this, petitioner, through its design engineering, accomplished one of the few innovations in airframe construction which has occurred in late years. This consisted of the designing of a metal wing surface with an inconsistent taper from root

to tip to a degree of tolerance theretofore unknown in airframe manufacture. When constructed, the wing appears to be slightly concave. In addition, petitioner designed for both the B–47 and B–52 a method of rolling the wing surface metal with the proper taper whereas theretofore it would have been necessary to machine it to the desired thickness tolerances.

The B–50 bomber is a propeller-driven aircraft which is an advanced B–29, which latter bomber was the bomber used by the Air Force in the Pacific theater of operations during World War II. Petitioner, under contract with the Air Force, manufactured 22 B–50 bombers during 1952. The contract called for the manufacture and delivery of 36 B–50's.

The Bomarc is an intercontinental ballistic antimissile missile. It represents the entry of the United States into the antimissile field. It consists of an airframe in which is contained a warhead, fuel-carrying capacity, and the plumbing necessary to its delivery to combustion chambers, a stable platform upon which is installed electronic equipment for ground control and for its self-guidance to a target, and gimbal-type combustion chambers for steering and stabilizing purposes. Petitioner, under Air Force contract, designed and constructed two such experimental missiles in 1952.

Upon the opening of hostilities in Korea in 1950, the Air Force had determined that the B–47 bomber represented its chief deterrent weapon with respect to threatened attack on the United States by an enemy country. It thereupon expanded its order for B–47's. It adopted a policy which required that they be manufactured not only by Boeing in Wichita, Kansas, but by Lockheed Aircraft Corporation and Douglas Aircraft Company in their factories situated elsewhere than Seattle or Wichita. To expedite the advent of the latter two companies into the manufacture of B–47's and to act as a clearinghouse for the problems which would thereby arise, the Air Force, in July of 1951, established the B–47 Joint Production Committee made up of representatives of the three manufacturers and the Air Force, with an Air Force officer as chairman. As design prime contractor of the B–47, petitioner was required by the Committee to furnish Lockheed and Douglas, competitors of petitioner, with master tooling gages which it had developed for production of the B–47, to furnish them with designs and drawings, to teach Lockheed and Douglas engineers and employees Boeing's production methods, and generally to make available to them its manufacturing know-how. Boeing actually furnished them 18½ complete sets of B–47 components and over 18,000 miscellaneous parts.

Under contract 22413, which was a cost-plus-a-fixed-fee arrangement entered into on October 31, 1949, petitioner manufactured and

delivered to the Air Force in 1952, 36 B–47's. This type of contract is customarily used for the procurement of airframes in their experimental and developmental stage. In this instance, it provided for the reimbursement to petitioner of all costs of production, together with a fixed profit of 6 percent of such costs in addition thereto. For B–47's delivered under this contract, petitioner in 1952 received cost reimbursement of $10,646,214 and a profit of $1,730,607.

Under contract 21407, which was a fixed price incentive-type contract entered into on May 10, 1952, petitioner, in 1952, manufactured and delivered to the Air Force 263 B–47's. This contract provided for the reimbursement to petitioner of all cost of production plus a fixed fee of 7½ percent of estimated costs, which estimated costs, as was the case with respect to each incentive contract here involved, were first negotiated between petitioner and the Air Force prior to the execution of the contract and were thereafter renegotiated as a "firm target" estimate of cost to apply retroactively and prospectively from delivery of the 100th bomber throughout the life of the contract. For its cooperation in the activities of the B–47 Committee and its aid in getting Lockheed and Douglas into the production of B–47's, the fixed fee was raised one-half of 1 percent so that petitioner's total fixed fee under this contract was 8 percent of the firm negotiated target cost estimate. The cost estimates as negotiated were based upon an 80 percent improvement rate. This rate of improvement is the average rate of the airframe industry upon the date of the execution of this contract. It means that each time the number of airframes produced is doubled, the latter half is produced for 80 percent of the cost of the former. The cost formula is represented in graph form in the industry by an 80 percent improvement curve. The incentive provision of this contract provides that in case petitioner in actuality underruns the firm target cost estimate, it will receive as profit, in addition to the 8 percent fixed fee, 20 percent of such underrun. In case of an overrun, petitioner must stand 20 percent of the overrun and the United States 80 percent provided the overrun does not exceed 125 percent of the firm target cost as negotiated. Petitioner must defray all cost overruns in excess of that percentage. At the termination of the contract the parties were to negotiate with respect to and finally agreed upon the actual allowable costs incurred with respect to performance of this contract. For B–47's delivered under this contract, petitioner, in 1952, received reimbursement of cost in the amount of $347,365,355, a profit of $33,-440,590 of which the incentive profit was $4,903,340.

The following is a list by number designation of the contracts in force between the Air Force and petitioner and under which petitioner

received renegotiable profits in 1952 and a general description of the goods manufactured and services performed thereunder:

| Type of contract, and contract designation or contracting party | Product or subject matter |
|---|---|
| Cost-plus-a-fixed-fee contracts: | |
| 21096 | Model B–52 airplanes and spare parts. |
| 19589 | Research and development Bomarc pilotless aircraft missile. |
| 22413 | Model B–47 airplanes and spare parts. |
| 6993 | Tucson modification of model B–47 airplanes. |
| 15065 | Model XB–52 and YB–52 airplanes. |
| 12883 | Model RB–47 mock-up. |
| 9945 | Modification of model B–50 airplanes. |
| 22064 | Modification of model B–50 airplanes bombing and navigation systems. |
| 22300 | Flying boom modification program. |
| 21388 | Phase I—Design of airplane. |
| 16141 | Modification of model B–47 airplanes. |
| 18130 | Model B–29 and model B–50 airplanes bombing system. |
| 22248 | Modification of model B–47 airplanes. |
| 9057 | Prototype installation on model B–50 airplane. |
| 19228 | Electric power sets. |
| 5154 | Gas turbine power unit. |
| 8119 | Modification of model B–29 airplanes. |
| 25915 | Engine studies. |
| 22108 | Modification of model B–47 airplanes. |
| 12226 | Model B–47 productibility study. |
| 26091 | Model 502–2C Turboprop development. |
| 17859 | Installation of photographic equipment on model YC–97 airplanes. |
| 14688 | Modification of model B–50 airplanes. |
| 50642 | Model 502–2 gas turbine. |
| 20014 | Storage and services. |
| 5167 | Model B–50 and model C–97 airplane tool storage. |
| 53503 | Model 502–2 gas turbine. |
| 25910 | Model B–47 airplane studies. |
| 20413 | Flying boom developmental and modification program. |
| 13875 | "GAPA" guided missile program. |
| 8004 | Modification of model B–47 airplanes. |
| Incentive-type contracts: | |
| 21407 | Model B–47 airplanes and spare parts. |
| 14764 | Model KC–97 airplanes and spare parts. |
| 14809 | Model TB–50 airplanes and spare parts. |
| 5097 | Spare parts. |
| 19823 | Model B–50 airplanes and spare parts. |
| 9825 | Model C–97 airplanes and spare parts. |
| 5805 | Model KC–97 airplanes and spare parts. |
| 5065 | Spare parts. |

| *Type of contract, and contract designation or contracting party* | *Product or subject matter* |
|---|---|

Price redetermination contracts:

| 14722 | Spare parts. |
|---|---|
| 53204 | Magnetic minesweeping equipment. |
| 6245 | Spare parts. |
| 17738 | Model B–29 and model B–50 kits. |
| 18821 | Model C–97 airplanes and spare parts. |
| 18302 | Modification of model B–50 airplane power packages. |
| 6231 | Spare parts. |
| 15587 | Model B–50 airplanes and spare parts. |
| 14747 | Spare parts. |
| 8498 | Spare parts. |
| 8166 | Bomb lifts. |
| 28882 | Spare parts. |
| 8783 | Services in connection with Government-furnished property. |
| 25898 | Sling assemblies. |
| 13013 | Model B–50 airplanes and spare parts. |
| 21763 | Spare parts. Miscellaneous minor contracts. |

Fixed price contracts:

Prime contracts:

| 22009 | Services of technical representatives. |
|---|---|
| 3699 | Repair of Government-furnished property. |
| 7610 | Suspension line clamps. |
| 3700 | Repair of Government-furnished property. |
| 20383 | Technical data. |
| 20578 | Spare parts. |
| 25932 | Sling assemblies. |
| 53975 | Model 502–2 gas turbine. |
| 17803 | Sling assemblies. |
| 9853 | Lock assemblies. |
| 4529A | Analog computers. |
| 70106 | Maintenance parts. |
| 6481 | Modification kits for jack assemblies. |
| 20756 | Special tools. |
| | Miscellaneous minor contracts. |

Subcontracts:

| Douglas Aircraft Company, Inc. | Material, parts, trailer, compressor unit. |
|---|---|
| Lockheed Aircraft Corporation | Material, parts, analog computer. |
| Curtis-Wright Aeronautical Corp. | Spare parts. |
| Briggs Manufacturing Company | Spare parts. |
| Grand Central Aircraft Company | Bomb rack assemblies and spare parts. |
| General Electric Company | Parts and engineering laboratory work. |
| National Rivet & Manufacturing Company | Material, parts. |
| Consolidated Vultee Aircraft Corp. | Pump assemblies, miscellaneous minor subcontracts. |

| Type of contract, and contract designation or contracting party | Product or subject matter |
|---|---|
| No-fee facilities contracts: | |
| 21378 | Special facilities. |
| 22291 | Special facilities. |
| 2862 | Special facilities. |

Petitioner produced B–47's in Government-furnished manufacturing facilities in Wichita, B–50's, Bomarc missiles, and B–52's at its plants in Seattle, and C–97's and KC–97's in a Government-furnished facility at Renton, a suburb of Seattle. Except to the extent petitioner used Government facilities for nonrenegotiable business, such facilities were furnished without charge to petitioner.

During World War II petitioner had used the Wichita plant for production of aircraft for the Air Force and had there employed over 20,000 persons in doing so. Upon termination of the World War II contracts, virtually all of this labor force had been discharged except for a skeleton crew of about 1,200. Because of the Air Force's insistence upon the manufacture of B–47's at Wichita, rather than Seattle and Renton where petitioner had an adequate, trained labor force, it was necessary for petitioner to recruit a new and untrained labor force again and of approximately the size there employed during World War II. Before 1952 the problem involved in recruiting such a labor force was that, in doing so, petitioner was in competition for labor with commercial manufacturers due to the "guns and butter economy" which then existed. In 1952 the problem so involved was that which necessarily arose in the fabrication and assembly of a new, complex, and extremely dense airframe represented by the B–47 with a new and inexperienced labor force which had to be trained. In addition, it was necessary for petitioner to train engineers and employees of Lockheed and Douglas in both Wichita and Seattle.

During its production of B–47's prior to 1952 and until April of that year, petitioner did not deliver in accordance with the contract delivery schedules. By April of 1952, it had attained the monthly rate of delivery required by the contracts and for the entire year produced and delivered the required number. Its delivery slippage was primarily due to its inexperienced and untrained labor force, but was secondarily due to the fact that its corporate executive and managerial organization was that of an essentially one-plant manufacturer. By January 1, 1952, petitioner had begun to make changes in its executive and managerial organization in accordance with recommendations made by a competent managerial consultant which it had employed prior to 1952 for the purpose of identifying and defining faults in its corporate setup and its operation which had the tendency to cause its cost of production to be high. The consultant, who had theretofore been without experience in the appraisal of an airframe manufacturer but who had much experience with automobile and other manufac-

turers, determined that petitioner's lack of direct labor standards was one of the prime factors leading to high production costs. He recommended the establishment and use of complete, factory-wide labor standards but estimated that such a procedure would require 3 years to complete. Although petitioner was using direct labor standards to a degree, it established a committee, which existed in 1952, for the purpose of studying the feasibility of establishing and using such standards in the production of an airplane such as the B–47. Over 60 percent of petitioner's labor force was employed in its assembly area, and it did establish and use additional labor standards in connection therewith. That portion of direct labor used in the fabrication of parts it determined was not amenable to such standards, however, and did not apply them to the same degree as to its assembly workers. Petitioner determined, after study of the problem, that to the degree it had not followed the recommendations of the management consultant, such proposed changes would cost more than they would save in production cost.

Although automobile manufacturers had successfully used direct labor standards in the production of B–17's and B–29's during World War II, those aircraft were so much less dense and presented such comparatively simple production problems that their comparison from a production standpoint with that of B–47's and B–52's is not significant. While an automobile manufacturer fixes his design at the inception of each new model and makes few if any design or other changes, Boeing, producing an airplane the design complexity of which, as originally accepted by the Air Force, was without parallel, was forced to incorporate about 8,000 design and other changes therein while producing 510 B–47's. About 2,000 such changes were ordered by the Air Force in 1952. The Air Force had adopted a policy that speed of production was more desirable than absolute conformance with contract specifications and to that end accepted certain B–47's which did not entirely so conform, reduced petitioner's profits according to such specification shortages, and established a modification center at Tucson, Arizona, wherein to bring such planes to specification. This procedure is not uncommon in the Air Force procurement of aircraft.

Under contract 6993 entered into in December of 1951 petitioner agreed to complete these modifications which in addition to bringing each plane to the specifications existing at the time of its construction also in some cases consisted of the incorporation therein of changes ordered as a result of the growth of the B–47. For 1952 petitioner was reimbursed for costs incurred in such modification in the amount of $11,661,257 and received a profit in addition thereto of $240,341.

The Air Force directed that the modification work be subcontracted and when it appeared in 1951 that the subcontractor was performing

in an unsatisfactory manner and petitioner suggested to the Air Force that it (Boeing) perform the work, the Under Secretary of the Air Force refused to permit the change. In order to make it possible for the subcontractor to perform adequately the required modifications, it was therefore necessary for petitioner to assign many of its top-grade personnel to the subcontractor's plant in order to train its employees. As of October 2, 1952, 178 of Boeing's finest shop, planning, inspection, and methods personnel were so assigned. Whatever the deficiencies were with respect to performance under this contract during 1952, they are not properly laid at petitioner's door. Its performance of this contract, in the light of the above circumstances, was reasonably efficient.

As before stated, the basic B–47 is susceptible to great growth possibilities. Changes ordered by the Air Force emanated alike from it and petitioner. As the growth of the bomber advanced the Air Force concept of its military use altered and this alone accounted for many changes. It was contemplated by both parties to these contracts at their inception that the B–47 would present novel production problems; that the speed of its production was a paramount necessity taking priority over complete compliance with contract specifications; that the later bombers produced, although like those first produced in basic conformation, would be radically changed in many ways throughout the performance of the contracts, and that time-consuming testing would be required with respect to such changes. In fact, both parties came to realize, as was the fact, that the B–47 and the changes made therein represented such an advance in the state of the art that the design of electronic and other equipment, such as the bomb-navigation system and jet engines, to be furnished by the Government, had not sufficiently kept pace so as to permit petitioner's incorporation of such equipment during production in some instances. Nevertheless such variances from contract specifications were listed as shortages and deficiencies at the time of delivery of aircraft which for such reasons did not conform to contract specifications.

Certain deficiencies in design engineering were disclosed upon testing of the B–47's. Typical of such deficiencies were the "Dutch-roll" and bomb bay buffeting. Both were conditions which became evident upon operation of the bomber at speeds never before attained by bombardment aircraft. The first has been described hereinbefore in connection with the reversal of lateral controls. The latter was caused by the action of air currents entering the bomb bay when its doors were opened while the plane was operating at extremely high speed. This air action had an adverse effect upon the accuracy with which bombs could be delivered. Neither condition could have been reasonably anticipated prior to the high-speed testing of the B–47. Another deficiency in design engineering was disclosed by testing. This was

damage to the trailing edges of wings caused by high-frequency vibration of a part of the fuel injection plumbing contained in the wings where, at certain speeds, such vibration would conform to and be accentuated by engine vibration. Each of these deficiencies was corrected by petitioner within reasonable times after their discovery. No airplane in the procurement experience of the Air Force was ever delivered without deficiencies and shortages.

The term "combat-capable" or "combat-ready" was in the minds of both parties to B–47 contracts descriptive of the condition of B–47's which were to be delivered by petitioner although that term is not used nor the thought otherwise expressed in the contracts. The specifications and the changes as ordered from time to time, though, do sum up to the Air Force's concept of those terms. Throughout the performance of the B–47 contracts the concept of combat capability, although basically unchanged, nevertheless altered with change orders brought about as the growth factor of the plane developed. From time to time B–47's were delivered to and accepted by the Air Force which therefore were not "combat-capable." Had the need arisen, however, to use such planes in case of attack upon the United States, they could and would have been used to deliver bombs to an enemy target. In fact, in 1952, the B–47 was the chief deterrent weapon possessed by the United States. Although some such "deficient" planes were delivered, their mere presence at airbases around the world had a deterrent effect upon the enemies of this country.

The Air Force had adopted a policy of wide subcontracting for a twofold purpose. It desired the manufacture of B–47's to be widely dispersed in order to lessen the total effect upon their production of an attack upon the continental United States. Seattle was a prime and easily located target for enemy bombing. During 1952 it was desired by the United States that employment be furnished to the economically depressed manufacturing areas of the country. Petitioner, as prime design contractor therefor, in addition to its own production commitments, became responsible for the production of B–47 parts in the plants of about 200 subcontractors and parts suppliers throughout the United States. Some of them, principally those which had been automobile or automobile parts manufacturers, not previously having had experience with the extremely close tolerances required for B–47 construction, had difficulty in the performance of their subcontracts and fell behind delivery schedules. It was necessary in those instances for top management personnel, much needed in petitioner's own plants, to be sent to the plants of such subcontractors to instruct them in production methods and procedures. Upon some occasions it was necessary for petitioner to cancel subcontracts with such subcontractors. Petitioner fulfilled its obligations with respect to subcontractors with ordinary efficiency.

During 1952 delivery schedules were altered by the Air Force largely for the purpose of allowing sufficient time for petitioner's incorporation in the B–47 of the numerous changes ordered therein, the increased amount of testing required thereby, and additional time for the arrival at its plant of necessary Government-furnished equipment, such as the bomb-navigation system. For that year petitioner delivered and the Air Force accepted B–47's in accordance with the contract schedules.

Petitioner's total investment in machinery, equipment, property, and plant at Wichita during 1952 averaged $2,397,866. Government-furnished facilities of the same kind at Wichita averaged during that year $34,875,128. About 88 percent of the plant floorspace used by petitioner in 1952 in Wichita in its production of B–47's was Government owned and furnished to petitioner without charge.

In addition to the land, plant, machinery, and equipment referred to above, the Government paid for the special (or contract) tooling, including jigs, dies, fixtures, molds, patterns, and special gages, usable on the B–47 airframe only. Machinery and equipment are usable in the production of several types of airplanes or in manufacturing generally, while special tooling is usable only in the production of one model or type of airplane. The special tooling was included in the supplies called for in the contract, so that petitioner not only was reimbursed for the cost of procuring the special tooling, but received an element of profit thereon.

Under B–47 contract 22413, as under its other cost-plus-a-fixed-fee contracts, petitioner was reimbursed "currently" for costs incurred in the performance of the contract, in weekly payments upon the payroll sheets, invoices, and other evidences of costs to petitioner. In addition, petitioner received 90 percent of its fixed fee in monthly installments based upon estimates of the percentage of completion of the work. Any unpaid balance of the fee was to be paid to petitioner upon completion of the work.

Under B–47 contract 21407, as under the other incentive contracts in force in 1952, petitioner received partial payments of 90 percent of the lower of the cost to petitioner of the property acquired or produced in the performance of the contract, or of the total contract price for articles still to be delivered. The remainder of the price was paid to petitioner upon the delivery of the airplane or other articles called for.

In the inception of the cost-plus-a-fixed-fee and incentive contracts under which B–47's and C–97/KC–97's were manufactured, arm's-length negotiations took place with respect to each aspect thereof. The same type of negotiation took place with respect to periodic change orders and particularly with respect to the fixing of a firm target cost. The latter event took place in the case of B–47 contract 21407 in No-

vember 1952. The negotiators were highly skilled and of more than ordinary competence on each side of the bargaining table. The negotiators had available to them experience in airframe procurement extending over many years and including the more recent procurement during World War II. They considered and gave what they considered to be proper effect to petitioner's net worth as applied to its prospective earnings, the fact that Government facilities were furnished petitioner free of charge, the rates of profit prevailing in the airframe industry, the amount and source of public and private capital to be employed by petitioner in performing the contracts, petitioner's contribution to the defense of the country, and, in fixing firm target costs, to the "deficiencies" of already delivered airframes. The firm target costs thus arrived at were in excess of $30 million below the proposals submitted by petitioner. Considering the complexity of design and the great growth potentiality of the B-47 with the unknown or unforeseeable changes which were to result therefrom, the negotiators arrived at reasonably accurate cost estimates.

Contract 21407 provided that for the purpose of negotiating a firm target cost petitioner was to furnish the Air Force its proposed firm target cost estimates and data in support thereof immediately upon completion of the 100th B-47, which event took place in June of 1952. Negotiations immediately commenced after petitioner's compliance with this provision, but due to the desire of the negotiators to obtain as much actual current cost data as possible, petitioner was required to furnish such data currently as negotiation continued. Largely because of this procedure the firm target cost was not agreed upon until November of 1952.

Boeing's corporate existence to and including 1952 has been marked from its beginning by a state of abnormalcy in the sense that it has not experienced any period where, except for long-lived Government contracts, its business has become stable. Its sole customer for all intents and purposes has been the United States. The exigencies of international politics have to a great extent constituted the catalyzing factor which has precipitated contracts from that customer. Whether those charged with the defense of this country felt the imminence of danger and the degree thereof determined the size of those contracts. The contracts could and upon occasion were terminated with little or no notice by the United States. This resulted in petitioner being forced to discharge nearly all its direct labor force and all but key people in its engineering staff. When a new contract was forthcoming it then became necessary to reemploy labor and engineering personnel and train them in petitioner's manufacturing techniques, a time-consuming and costly process. The extent of employment was dependent upon the size of each contract and the extent of necessary

training depended upon the nature of the product to be produced thereunder and the past experience of new employees.

Petitioner's price per pound of production in the case of the C-97/KC-97 decreased from $35.89 in 1946 to $15.15 in 1952 and its profits per pound decreased accordingly. In the case of the B-47 its price per pound decreased from $47.10 in 1949 to $22.53 in 1952.

The petitioner's renegotiable profit for 1952, $56,734,119, is 98 percent of the amount of its book net worth, $57,794,057, as of the beginning of that year. Adjusting its book net worth at the beginning of the year to its average book net worth for 1952 and for the value of its design, engineering, and overall manufacturing know-how, we find its percentage of profit to net worth was approximately 50 percent in 1952. Its volume of sales was among the 50 leading American industrial concerns measured by the volume of sales. Of the 50 leading concerns, with the exception of petitioner, the average percentage of profit to net worth during 1952 was 26.9 percent.

During 1952 petitioner's labor costs and those for materials, with the exception of direct labor in the case of C-97/KC-97 production, were influenced by a rising market and were higher than in the immediately preceding years. At the same time its total average cost per airplane produced based upon a reasonably adjusted statement of work performed, in the case of B-47 production, decreased from $1,781,000 for those produced under contract 22413 to $861,000 for those produced under contract 21407 and its cost per plane in the case of C-97/KC-97's produced under contracts 12450, 18821, 9825, and 14764 decreased respectively as follows: $1,286,000, $635,000, $597,000, and $438,000.

Due largely to a rising general economy petitioner's production overhead costs at Wichita rose from $2.14 per hour in 1951 to $2.82 per hour in 1952.

Petitioner's compensation to its corporate officers was low in 1952 in comparison to industry generally. Its dividend policy was conservative based on the same comparison. It paid bonuses to its employees under an "incentive compensation plan" of $2,500,000. The payment of bonuses was based upon the profits of the company and the plan was implemented at least partly as an incentive to lower the overall cost of production.

Petitioner's products under the contracts here involved, with the exception of the C-97, bear little similarity to its peacetime products. The only similarity is that in each case the product is an airplane. The C-97 is the military counterpart of the Stratocruiser commercial airliner which was produced for a short time by petitioner at the close of World War II. Its production of Stratocruisers resulted in substantial financial loss. It, in fact, has never prior to 1952 successfully engaged in business on a commercial basis. Its construction of Strato-

cruisers for the commercial market was primarily for the purpose of maintaining in its employ a core of experienced engineers and production personnel. In its history petitioner has had no peacetime experience which is reasonably comparable to its wartime experience. Its history discloses no period of normal operation which is reasonably comparable to its performance under the contracts at issue.

Petitioner subcontracted, in terms of direct labor-hours, 27 percent of its production of B–52's, 32 percent of B–47 production, and 25 percent of KC–97 production. Its production of B–47's and KC–97's in 1952 was almost entirely by the use of Government-furnished facilities.

Its 1952 profits, compared to industry as a whole, were high.

The petitioner's profits of $56,734,119 for 1952 are unreasonable and excessive in the amount of $13 million.

### OPINION.

The burden of proof in these *de novo* proceedings rests upon the petitioner to establish by a preponderance of the evidence that its renegotiable profits during the year ended December 31, 1952, of $56,734,119 were reasonable. In determining the reasonableness of those profits, we are guided by the provisions of the Renegotiation Act of 1951 and aided by the rules and regulations of the respondent and the decisions of this Court. The phrase "profits derived from contracts with the Departments and subcontracts" as used in section 103(e) of the Act is defined in section 103(f) thereof as "the excess of the amount received or accrued under such contracts and subcontracts over the costs paid or incurred with respect thereto and determined to be allocable thereto."

In its pleadings and on brief respondent takes issue with petitioner's right to favorable consideration with respect to every criterion for decision provided by applicable law and its own regulations. Even so, however, its primary contention is that petitioner's profits constitute an unreasonable return upon its invested net worth during 1952. Petitioner recognizes that its return on its book net worth during that year is abnormally high but contends first that its book net worth is an unreliable, inaccurate, and unfair picture of its true net worth and, lastly, that any use of the net worth factor in this particular case is unwarranted and of no value in determining the reasonableness of its profits; that, in lieu thereof, we should measure its profits by a comparative ratio of its profits to its sales.

We cannot agree with either contention. The contractor's return on its invested net worth must be given consideration but in the light of and in conjunction with the other statutory factors. While it is true that petitioner's return of profit upon its book net worth indicates an unusually high profit, its books do not account for the value

of its design engineering and manufacturing know-how. Although the record does not show the specific value thereof, when considered as a whole, it does indicate that these categories of know-how in the highly competitive airframe industry constitute an asset which is of great value which should be added to its book net worth in applying the net worth factor. See *Aircraft Screw Products Co.*, 8 T.C. 1037.

The petitioner obtained the contracts here involved by virtue of the application of this asset in competition with its competitors. In order to remain competitive in the industry, it is necessary that the design engineering staff of a member not only keep pace with the rapidly advancing art of airframe design, but be capable of leading the advancement. This we think has occurred here with respect to the B-47 and B-52 designs. It is reasonable to conclude that this asset in petitioner's case was of at least the value of all its book assets combined. So viewed petitioner's return on its whole net worth is approximately 50 percent.

Respondent contends that petitioner was inefficient in its performance of each contract here at issue but emphasized on trial and on brief only those involving B-47, C-97/KC-97, B-52, Bomarc, and B-50 production in that order. We here follow this lead. We have found as a fact that petitioner, under the conditions prevailing in 1952, performed under the contracts in a reasonably efficient manner. Over 61 percent of its profits for 1952 was derived from contracts 22413 and 21407 under which it manufactured B-47 airframes. Respondent, in contending that petitioner was inefficient, completely disregards the true conditions under which these contracts were performed. The B-47 was of a character with which neither the Air Force nor any manufacturer had theretofore acquired more than meager manufacturing experience. It is true that the basic principle that an airplane must consist of fusilage, wings, control surfaces, landing gear, and a means of motive power was ancient. It is even true that the sweptback design of a wing and a tandem or bicycle landing gear did not emanate from petitioner. The fact is, however, that the use of a thin, sweptback wing of high aspect ratio on a bombardment-type aircraft was unique in 1952 and prior thereto. The B-47 was designed to perform and did perform at speeds and altitudes never before attained. It contained equipment of a nature never before used in bombing aircraft. The nature of such equipment, its fittings, wiring, and placement created manufacturing problems for which there was little if any precedent. The B-47 was the "densest" bombardment aircraft ever produced. The B-47 design as accepted by the Air Force during World War II was so accepted substantially because of its unusual growth potentiality. Both parties to the contract anticipated, as was the fact, the exploitation of these possibilities. Because of this factor over 8,000 change orders were issued by the Air Force during the life

of contracts 22413 and 21407, 2,000 of them occurring in the year 1952. These changes in many instances required an alteration in the design of the B–47 and many of such changes required exhaustive testing after their incorporation. The extent of such testing and problems which arose from the changes and were disclosed by the testing we are convinced could not reasonably have been foreseen by petitioner.

Another circumstance which is disregarded by respondent is the effect of the Air Force's changing concept of combat suitability or combat readiness. Neither of these terms was used in the B–47 contracts, but it is clear to us that both parties knew and contemplated that the airplanes were not manufactured in accordance with contract specifications unless they were capable of delivering their bomb load accurately upon an enemy target while providing a degree of safety for the crew and the capability of return to base. However, combat suitability was a variable term in this instance. As exploitation of the B–47 growth potential progressed, more and better performance was expected by the Air Force in order for the plane to fulfill its concept of combat capability. Some of the B–47's delivered to and accepted by the Air Force in 1952 were not, by this measure, combat-suitable. In many instances this was so because Government-furnished equipment, such as parts of the water injection system, jet engines, bomb-navigation system, and electronic defensive armament, had not been available to petitioner at the date of delivery. In most cases their nonavailability was caused by the fact that their manufacturers had not kept pace with the advancement in the art of airframe design exemplified by the B–47.

Respondent complains that the B–47's in some cases evidenced faulty and inefficient design engineering. Typical of such cases is the "Dutch-roll," cracking of trailing wing edges caused by sonic vibration of water injection plumbing installed in the wings, cracking of and difficulty in jettisoning the cockpit canopy, and bomb bay buffeting caused by the air currents entering the bomb bay when its doors were opened. Each of these difficulties became evident only upon the high-speed testing of the airplane and could not in our opinion have been, by the use of design engineering efficiency, foreseen prior to actual testing. These defects, along with others pointed to by respondent, were corrected as speedily as was reasonably possible by petitioner. We note too that the Air Force in all its procurement experience had never known of an instance where an airplane had been delivered without deficiencies and it is in fact clear from this record that it viewed the B–47 procurement with such deficiencies in mind. It adopted a policy upon the advent of the Korean hostilities of accepting B–47's as rapidly as possible whether or not they were in every respect combat-suitable and, under contract with peti-

tioner, set up a rehabilitation center at Tucson, Arizona, wherein to bring such planes to a state of combat suitability.

Respondent complains too that deliveries of B–47's fell behind contract delivery schedules. While it is true that the required monthly rate of delivery was not being met during the first part of 1952, that rate was met by April of that year and its deliveries for the entire year were in accordance with contract delivery requirements. Under the circumstances we are unable to conclude that petitioner was inefficient in its design engineering or the quality of B–47's produced or its compliance with delivery schedules in its production of B–47's.

Respondent, in contending that petitioner was inefficient, points to petitioner's failure to adopt and use time and motion man-hour standards in its B–47 production at Wichita. In doing so, it implies that petitioner should have more closely complied in that respect with the recommendations of a management consulting firm which petitioner had employed in 1951 to make a management survey for the purpose of identifying management problems in its corporate organization and management operations which tended to result in high cost of operation. That petitioner obtained the consultant's report and recommendations tends, it seems to us, to evidence an intention and effort to lower its cost of operation. That petitioner did not during 1952 adopt and put into effect completely the consultant's recommendations is understandable and not inconsistent with the efficiency of its operation. The consultant, although widely experienced in the operation of manufacturers generally, had never theretofore surveyed and made recommendations for the improvement of operation of an airframe manufacturer. An examination of his report and review of his testimony leads us to believe that he was preoccupied in his opinions with the use of direct labor standards in the automobile industry and particularly with respect to such standards used by that industry in the production of B–29 bombers during World War II. We do not find that the operation of an automobile plant to construct either automobiles or B–29's was sufficiently akin to petitioner's production of B–47's to warrant a conclusion that universal company-wide use of direct labor standards would necessarily have resulted in greater efficiency and resulting lower cost of production. The underlying difference lies in the nature of the articles being manufactured and the manufacturing policy relating thereto. An automobile is mass-produced in numbers far greater than those involved in petitioner's production of B–47's. Mass-production machine tools are there usable to a much greater extent because of the auto-manufacturer's policy of adopting a fixed and virtually unchanged design for each model, production of which is much greater in number, while petitioner was here required in the year 1952 alone to adopt and adapt into its manufacturing operations about 2,000 changes, many of them

being so basic as to require a change in design while producing comparatively few B–47's. To a lesser degree, the same may be said with respect to the manufacture of B–29's. Compared to the B–47, its design was relatively simple and it was much less dense in that more internal space was available for the assembly operation. Petitioner employed only about 60 percent of its direct labor in the assembly area of its plant, while the remaining 40 percent was employed in the fabrication areas thereof. After detailed and conscientious study of the recommended adoption of complete labor standards, petitioner, in the use of reasonable management judgment, determined to use such standards in its assembly function and to use them to a lesser degree in its fabrication function. It had employed such standards in its assembly areas prior to the report of the consultant and continued to do so in 1952. In the consultant's opinion a period of 3 years would have been required to install complete labor standards in petitioner's plant. Petitioner judged it to be doubtful that the cost of installing such standards over that period of time would actually lessen its cost of production. We think petitioner's use and nonuse of direct labor standards was justified under the above circumstances and did not result in inefficient performance leading to high production costs.

Respondent contends too that defects in petitioner's corporate executive line of authority and responsibility tended to inefficient management and resulted in high production costs. It is true that prior to January 1, 1951, nearly all of petitioner's executive authority and the responsibility for its overall supervision and management resided in its president. Its character was that of a one-plant, single-site manufacturer. In essence, when petitioner was not manufacturing under contracts with the Government, it was a one-plant operation centered in and about Seattle. When in 1952 the Air Force greatly expanded its demand for B–47's and still required that they be manufactured in the Government plant at Wichita, Kansas, the resulting decentralization of petitioner's operation would have placed a nearly impossible burden upon its president had petitioner failed to alter its executive function. The management consultant, above referred to, had pointed to the foregoing situation as a defect in petitioner's corporate organization which would lead to high-cost production and had, in 1951, recommended rather sweeping changes therein. Among such recommended changes was the delegation by the president to executive vice presidents of a portion of his executive authority and responsibility. As of January 1, 1952, petitioner had transferred such authority to an executive vice president who was made responsible for petitioner's Wichita operation, and he remained in that capacity throughout 1952 and thereafter. In our view whatever high production cost tendencies existed prior to 1952 which were caused by the one-plant, one-site character of petitioner's corporate organization

were with reasonable promptness corrected or in the process of being corrected by January 1, of 1952.

Respondent also contends that petitioner was inefficient and negligent in its compliance with the directives of the B-47 Committee, referred to in our findings. The chief complaint is with respect to petitioner's alleged failure to furnish Lockheed and Douglas timely with master gages and design information which would permit those companies to begin the production of B-47's earlier. Although the record does indicate some delay in the early stages of the operation of the B-47 Committee with respect to petitioner's furnishing of master gages, it also shows clearly that because of petitioner's cooperation and attention to the directives of the Committee, Lockheed and Douglas were able to begin full production of B-47's earlier than had been expected by the Committee or the Air Force. We think respondent's complaint in this respect is not well grounded.

We have carefully examined the record with respect to the alleged inefficiency of petitioner in the supervision of its many subcontractors and suppliers and cannot conclude that, under the circumstances, petitioner was less than ordinarily efficient in this regard. The policy of the Air Force with respect to subcontracting was that it be carried out on as wide a base as reasonably possible; that the plant facilities and labor force of economically depressed areas of the country be employed wherever possible. This resulted in petitioner, which as prime contractor was responsible for the performance of subcontractors, having to provide the necessary supervisory and other personnel to supervise about 200 subcontractors and suppliers with respect to the B-47 production alone. As has been before stated, the tolerances necessary and allowable for B-47 production were theretofore virtually unknown in the manufacturing industry in this country, particularly in the manufacture of automobiles. Automobile manufacturers comprised a substantial proportion of the subcontractors used in the production of B-47's. Even though petitioner needed its experienced and trained personnel in its own production of B-47's, it was forced to assign substantial numbers thereof to the subcontractors' plants for varying periods in order to train sufficiently the subcontractors and in some cases assist in the layout of machinery in their plants to permit them to perform adequately under their subcontracts. In some cases it was necessary that subcontracts be canceled because of the inability of certain subcontractors to produce to such close tolerances. It must be borne in mind too that petitioner's supply of experienced and trained personnel was limited in 1952. No subcontractor could be employed or discharged by petitioner without the authorization of the Air Force or the B-47 Committee. Even so, respondent complains that petitioner did not furnish sufficient supervisory help and, in those cases where it was necessary to dis-

charge subcontractors, did not discover their inadequacies and discharge them soon enough. We think respondent is unreasonable in this complaint and that petitioner was reasonably efficient in its relations with subcontractors.

Petitioner's performance under the B–47 contracts is graphically illustrated by its cost underrun of the 80 percent improvement curve which represents the average cost of production improvement in the airframe industry in this country. Its performance was on a 65 percent improvement curve. Respondent contends that this illustration is misleading and not significant because such an improvement curve, prior to the setting of a firm target cost, incorporates costs which were incurred only once and which are nonrepetitive. We are unable to follow this line of reasoning as the very nature of an improvement curve seems to us to require the inclusion of all costs repetitive or nonrepetitive, and it is obvious that, nonrecurring expense being included in both curves, the cost underrun is valid and significant. The inclusion of nonrepetitive costs, which might be expected in the early stages of production of an article as complex and unique in its manufacturing problems as a B–47, would be the very factor which would impart the rapid reduction in cost evidenced by an improvement curve of these percentages. Because petitioner's production costs underran the industry average, $5,826,656 profit accrued to petitioner in 1952 under the incentive provisions of its contracts, over $4 million of which is attributable to contract 21407.

The record is clear that in 1952 petitioner's deliveries of B–47's were on schedule and that the B–47 which it produced was of good quality and exceeded in performance the expectations of the Air Force. If any portion of petitioner's profits for 1952 was unreasonably high, it did not result from any inefficiency in its manufacture of B–47 bombardment aircraft.

In 1952 petitioner was under contract to manufacture B–47's in Wichita, B–52's and Bomarc missiles in Seattle, and KC–97's in Renton. In addition it was the prime contractor responsible for the performance of about 200 subcontractors and many parts suppliers and also was required to do all things necessary to the advent of two of its competitors into the manufacture of B–47's in addition to functioning as a member of the B–47 Joint Production Committee and overseeing and being responsible for the performance of a subcontractor located in Tucson, Arizona, who was charged with the bringing of all "deficient" B–47's to a state of "combat capability" or "readiness." Generally, with respect to each of its functions a different person or officer, responsible to the Air Force, was charged with overseeing petitioner's performance in respect thereto. In each case such individuals were understandably primarily interested in only that function each was to oversee. The tendency of such overseers

was to consider as performance defects any emphasis placed by petitioner upon one or the other of its contractual obligations which was at all detrimental to another such obligation. We think this record is replete with such instances which account largely for respondent's contention that petitioner lacked efficiency in the performance of these contracts.

Complicating the picture still further is the fact that the manufacturing problems incident to the B–47's were in many respects unprecedented and had to be solved as production proceeded and this while petitioner was incorporating some 2,000 changes in the product being manufactured, many of which changes involved changes in or new design. The tooling problems with respect to preparation for production of B–52's were so complex and unprecedented that they constituted the most difficult such problems an experienced aeronautical engineer had ever encountered.

The Bomarc missile prototype construction and testing represented the first effort of the United States to enter the anti-missile-missile field and also necessarily presented theretofore unknown problems. With respect to B–52 and Bomarc contracts both parties thereto were more or less groping in the dark with respect to the costs involved. The statutory criteria for decision are in large part unhelpful with respect to the latter contracts because of the nature of the work being performed and the products produced thereunder.

Petitioner's performance under its C–97/KC–97 contracts leaves something to be desired in the way of design engineering efficiency. This airplane is a tanker, the purpose of which is to refuel B–47's in flight. Important in their equipment is tankage for aircraft fuel. In 1952 it developed that such tanks had been designed by petitioner and produced by a subcontractor with the metal comprising the ends thereof of insufficient gage to withstand the stresses of changes of altitude so that some of them collapsed in use. Although this defect was promptly corrected after its discovery, we think petitioner, by the use of ordinary efficiency, could and should have foreseen the problem and designed to avoid it thus reducing its cost of production. Other deficiencies in the KC–97 pointed to by respondent do not appear to have been foreseeable or discoverable short of actual testing, and they appear to be the defects which would normally appear in the development of a new product.

Petitioner's performance of its B–50 contracts was not impeded by the factors above noted with respect to performance where a new product was involved. The B–50 is an improved version of the B–29 bomber with respect to which petitioner had, during and before 1952, much manufacturing experience. Its contract 14809 called for the delivery of 36 B–50's in 1952. It actually delivered only 22 of them. The record contains no adequate explanation or excuse for Boeing's

failure to deliver B–50's in accordance with contract delivery schedules. Petitioner's cost reimbursement under these contracts was $22,557,860 and its profits $1,852,366. It was clearly inefficient in its delivery of B–50's in 1952.

Because of the assurance of return of all costs expended or incurred by petitioner with respect to its performance of the contracts here involved and the periodic payment of profits which are based upon negotiated estimated costs, we find petitioner incurred no risk of loss thereunder within the meaning of the Renegotiation Act by reason of any failure to meet delivery schedules or failure or inability to meet quality specifications. The only possible risk inherent in any of these contracts is exemplified by the B–47 incentive contract where petitioner would receive no profit but instead would experience a loss in case its cost of production overran the firm target cost estimate by 125 percent. Under the facts we do not think this risk was at all significant. It is clear from the record, however, that petitioner did incur considerable risk of another sort.

As we have found, the airframe industry is extremely competitive and has experienced increasingly rapid advancement in the art of airframe design. This condition has, in fact, led us to conclude that petitioner's design engineering staff and manufacturing know-how are to be considered a part of its net worth in considering the statutory net worth factor. Because of the decision of the Air Force to have B–47's manufactured by two of petitioner's competitors and petitioner's cooperation with that decision, these competitors were placed in possession of master gages and designs developed by petitioner and their engineering and labor personnel trained in petitioner's manufacturing technique and procedures. In short, the competitors were given petitioner's manufacturing know-how with respect to the manufacture of an airplane which was clearly a prototype for future commercial airline use. Petitioner believed at the time that a potential commercial market existed for such airframes. Afterevents have borne this out. The benefits petitioner would normally have expected to reap because of its position as the designer and developer of the first sweptwing jet-powered airplane suitable for commercial airline use were voluntarily relinquished in its cooperation with the B–47 Committee. That it was paid for its part in making it possible for Douglas and Lockheed to manufacture B–47's does not in our view detract from the risk it incurred nor adequately compensate it for this type of risk.

Because in this case we lack most of the statutory criteria for determining the comparative reasonableness or excessiveness of petitioner's 1952 profits, we have used the net worth factor to a large degree in determining the reasonableness or excessiveness of petitioner's profits as a comparison to other business. In doing so, we have ad-

justed petitioner's book net worth to include what we have concluded is a fair value for its design, engineering, and manufacturing know-how and have used an average 1952 book net worth as distinguished from its beginning 1952 book net worth. We have not adjusted the book net worth to reflect current market value of its assets because there is no comparative criteria in the record based upon such an adjustment to net worth. We have considered the fact that, whatever petitioner's adjusted book net worth may be, it was to some extent invested in its work in progress during 1952 for a period beginning years prior to 1952 with its first efforts in the design and development of the B-47. We have by this method arrived at a ratio of profit to net worth of about 50 percent. The ratio of profit to average book net worth for all manufacturers in 1952 was 22.1 percent and when limited to the six manufacturers of airplanes and parts having no long-term debt, before renegotiation of their profits the ratio is about 44 percent.

Petitioner urges that in lieu of the net worth factor we should use as a more meaningful factor the comparative ratio of profit to sales. We have not done so here for the reason that such a factor does not take into consideration one of the important differences (so far as the record shows) which may exist during 1952 between petitioner and other manufacturers including those engaged only in airplane manufacture. That difference may be the great preponderance in petitioner's case of Government-furnished facilities and production equipment over that furnished by petitioner. The record is silent in this respect with regard to others engaged in the manufacture of air-planes and other manufacturers generally. We think, as the re-spondent contends, that petitioner's profits cannot be viewed in the same light as those of a manufacturer which in performing a Govern-ment contract furnishes all or a major proportion of the manufactur-ing facilities used. It seems clear to us that, regardless of petitioner's efficiency, its contribution to the defense effort, the risk it assumed under the B-47 contract, and the complexity of the manufacturing techniques required in its performance of the contracts at issue, its function with respect to the production of B-47's and C-97/KC-97 airframes was, as respondent contends, to some extent that of a man-ager and not a manufacturer. That is not to say, however, that in the light of the other statutory factors, petitioner's profits can be limited by this fact alone.

Clearly in producing a new and complex product as rapidly and of the quality represented by the B-47, beginning with a virtually un-manned facility (the Wichita plant) and at the same time making it possible for its two chief competitors (Lockheed and Douglas) to manufacture them and supervising the output of highly complex parts by many inexperienced subcontractors and suppliers, constitutes

performance of these contracts which is deserving of higher compensation than would be indicated by the sole criterion of the percentage of contractor-owned facilities employed in the manufacture of B–47's and C–97/KC–97's. Particularly is this true when the importance of the B–47, the B–52, and the Bomarc missile to this Nation's defense is considered.

We have therefore concluded that on a comparative basis petitioner's 1952 aggregate profits are unreasonable and excessive to an amount less than that contended for by respondent.

The contribution made by petitioner to the defense of the United States must be viewed with respect to its 1952 experience alone. Basically its design of the B–47 and the KC–97, together with its in-flight refueling equipment, and its design of the B–52 were accomplished prior to 1952 and cannot be considered a contribution in that year. The connotation of the word "contribution" as used in the Renegotiation Act is, in our view, broader than its dictionary meaning. It includes not only services performed without compensation, but the cooperative and enthusiastic performance of that work and, in addition, the importance of the product produced and the services rendered, even though paid for, to the defense of this country.

There can be no doubt here that those charged with this country's defense in 1952 believed the country to be under imminent peril of attack by an enemy or enemies; that they had fixed upon the B–47 bomber as our chief deterrent to such attack and were so determined to obtain B–47's as rapidly as possible that a policy was adopted whereby they would be accepted by the Air Force with deficiencies in combat capability in order to have them in apparent readiness at our Strategic Air Command bases around the world. They constituted, in 1952, the best air weapon in the possession of this country and were in that year superior in quality and performance to any bomber or interceptor airplane then in existence as an operational weapon.

The KC–97 tanker airplane and its in-flight refueling equipment were likewise of great importance to our defense for its function was to extend the range and bomb-carrying capacity of the B–47.

The development of the Bomarc antimissile intercontinental ballistic missile was the initial phase of this country's effort to counteract the threat of nuclear attack from abroad, and we think its importance as a contribution to this country's defense is self-evident.

We take judicial notice of the fact that the creation of each new and increasingly efficient and potent weapon throughout history has been accompanied or closely followed by the creation of corresponding defenses thereto. For that reason the designing and construction of tooling for the two experimental B–52's were likewise of vital importance to the defense of this country. The B–52 represented an advance over the B–47 as great or greater than the latter's advance over

the B-29 of World War II fame. It has now become the chief deterrent weapon of the Strategic Air Command and as such, together with our missile strength and the continued use of B-47's, constitutes a major defense weapon. Petitioner's cooperation with the B-47 Joint Production Committee and with its incidental delivery to its competitors of not only designs and master gages developed for manufacture of the B-47, but its delivery to them of and the actual training of their personnel with respect to its manufacturing and procedural know-how constitute, we find, an important and substantial contribution to this country's defense in 1952.

Prior to 1952 petitioner's corporate character was essentially that of a centralized, one-plant manufacturer. Upon the acceptance by the Air Force of its B-47 design with the resulting contracts for its manufacture at Wichita, Kansas, and the contract for the manufacture of C-97/KC-97's at Renton, Washington, petitioner was forced to reassess the capability of its corporate and managerial organization in the light thereof. At least partly at the suggestion of the Air Force, it employed the services of a competent management consulting firm for the purpose of identifying and making suggestions with respect to the correction of such corporate organizational defects as would tend to cause inefficient, high-cost operation. It, thereafter, beginning in January of 1952, began to alter its corporate organization so as to delegate its executive managerial function to executive officers who were placed in immediate charge of and made responsible for the operation of each of its manufacturing divisions.

The source and nature of materials used by petitioner do not appear to be of material significance here. The complexity of petitioner's manufacturing techniques was controlled by the complexity of design of the B-47 and B-52 airplanes which we find to be unprecedented in the airframe industry and with which we have dealt more in detail elsewhere herein. The bulk of the subcontracting, its nature, and petitioner's problems in connection therewith have also been dealt with above.

The statutory use of the phrase "inventory turnover" has reference not to a parts and materials supply but to the item of property to be sold. In this case it consists of work in progress, i.e., airframe at varying stages of completion. We do not find the inventory turnover factor to be of significance here for the reason that the evidence before us indicates that various methods of computation, all of them justified to some extent, produce turnover rates for petitioner of from 20 times to 2 times per year. Six inventory turnovers was the average in 1952 for the 49 other leading American industrial concerns heretofore mentioned.

Of greater significance we think is the fact that petitioner's operations were largely financed by the United States through early reim-

bursement of costs and payments of profit through progress payments and the furnishing of Government-owned manufacturing facilities, Petitioner contends that the latter factor particularly and the former generally have been given due consideration in the negotiating of the rates of profit negotiated with respect to the B–47 and C–97/KC–97 contracts. Respondent contends, on the other hand, that whatever those rates were they are unreasonable in view of the fact, as it contends, that with respect to these two products petitioner acted only as a manager and not as a manufacturer and that the negotiated rates are premised upon the proposition that petitioner was to bear the same risks as one who finances himself in these respects. Petitioner's rate of profit on the B–47 contract was 7½ percent of allowable costs. On the C–97/KC–97 contract it was 9 percent of such costs with respect to deliveries under contract 9825 and 8 percent under contract 14764. Inasmuch as these rates are roughly in the same range with rates for products produced and services rendered in facilities wholly owned by petitioner, we are unable to agree with petitioner's contention. In this connection we note also that the negotiated rates compare favorably, so far as this record is concerned, with other airframe manufacturers' rates of profit where, so far as is shown here, such other manufacturers have furnished their own production facilities. It follows, we think, that petitioner's rates of profit on the B–47 and KC–97 contracts were to some extent unreasonably high and clearly so when applied to estimated as distinguished from actual cost of production.

It is with respect to the application of subsection 103(e)(6) that it most strongly appears petitioner's 1952 profits of over $56 million are to an extent unreasonable.

Eighty and eight-tenths percent of the profit here under consideration was derived from performance under what are here termed incentive contracts. Such contracts are based upon estimated cost of production. They are exemplified by contract 21407 whereunder petitioner received a fixed and unchangeable percentage fee applied to a firm target cost negotiated and agreed to subsequent to the delivery of the 100th B–47 and 20 percent of the difference between the firm target cost and actual costs as negotiated and agreed upon at the termination of the B–47 contracts, but only in case actual cost underran the target cost. In case petitioner had overrun the target cost its profit would have been 8 percent of target cost less 20 percent of such overrun. Should the overrun have exceeded the target cost by 125 percent, petitioner was required to pay all costs above that percentage and in case the overrun exceeded about 121 percent, petitioner would have ceased realizing a profit. Such contracts had been put in use in Air Force procurement in order that an incentive for the lowering of production costs be made available to contractors. Contracts 21407

for the production of B-47's and 14764 for the production of KC-97's, together with the other incentive contracts under which petitioner received renegotiable profits in 1952, did not carry out the purpose of tending to lower production costs.

Boeing in 1951 was an inadequately financed and equipped airframe manufacturer as compared to its aggregate obligations under incentive contracts then in force and contracts which were of that type executed in 1952. It is reasonable to conclude from this record that this condition was one of the prime factors leading to the use of such contracts in this instance. Boeing was the designer of and had the only production know-how with respect to B-47's, the refueling equipment of KC-97's, and B-52's. The Air Force, due to what it considered to be an imminent threat of attack upon the United States, required the manufacture and delivery of B-47's as rapidly as possible. It was therefore essential that Boeing be maintained in a healthy financial condition and that no time or effort should be lost in its self-financing. To that end, some basis for such financing was sought and weekly progress payments based upon actual costs and monthly payments of a portion of Boeing's profit were agreed upon. In order that Boeing might maintain its operating capital position, it was agreed that its basic profit payments would be unalterably fixed at a percentage of the cost of production which it and the Air Force could agree upon prospectively as an estimate, taking into account all known and foreseeable elements of cost. In the instance of the B-47 and B-52, due to their great advance in the art, their manufacture was bound to present unexpected design and production problems, which contingencies constituted an undesirable risk to petitioner's operating cash position, alike undesirable to both parties. These two aspects of the incentive contracts before us were clearly adopted as a substitute for bank financing. That this is true is further demonstrated by the fact that although the Government agreed to take title to work in progress, as payment therefor was made, it was at the same time agreed that petitioner would not thereby be relieved of risk. We view these payments regardless of their labels as in the nature of loans. Actual profits and costs in their entirety could not be and were not, under these contracts, determinable until the contracts had been fully performed in a year subsequent to 1952. This is true because, although by far the greater portion of petitioner's profit was based upon estimated cost, a substantial portion represented by incentive profit could be determined only after agreement upon actual allocable costs at that time. In view of its inadequate financing Boeing literally could not await the completion of these contracts for its profit and remain in business. The B-47 procurement was, when initiated, the largest single procurement ever to that time made

by the military services of this country. Both the Air Force and petitioner negotiated the estimated cost thereof in its inception and at the time of the cost-reset in good faith, with highly qualified negotiators, with much past experience in airframe procurement and with full knowledge of all available information on the subject. In setting the rate of profit on the estimated cost, they considered and gave what they considered to be proper credit to the Government for its facilities furnished the petitioner without charge. In connection therewith they considered and gave effect to the relationship of petitioner's net worth to its anticipated profits. They considered and gave effect to the source and amount of petitioner's invested capital. They could not, however, for lack of precedent, foresee and give effect to the problems which arose because of the complexity of design of the B–47 and because of its great growth potentiality. That the latter factors were unknown strengthens our belief that neither party envisaged the progress payments as other than Government financing of petitioner.

Because petitioner's real profit was not determinable until the incentive contracts had been fully performed, it follows that under those contracts such profits were finally fixed when actual costs were known. Actual cost being determinable when final profits were computed we see no justification for the payment to petitioner of more profit than that which would accrue to it by application of a reasonable percentage profit rate to actual as distinguished from estimated costs. Otherwise, with that rate applied to estimated firm target costs the very purpose of this type of contract is vitiated. With the rate factor so applied it is obvious it will produce profits in direct ratio to the estimated cost, thereby creating a high estimated cost incentive rather than the contrary. Coupled with the 20 percent sharing of underruns of cost, the high estimated cost tendency is enhanced. Only provided the profit rate factor is applied to actual cost and the firm target cost estimate used as a measure for under- or over-runs does the effect of the contract provide any incentive to lessen actual cost. Even so applied, however, such contracts are identical with cost-plus-a-percentage-of-cost contracts in that they contain an obvious incentive to increase actual cost. This is offset only by the necessity to lower actual cost in order for the contractor to share in the underrun on a 20 percent basis. Simple arithmetic demonstrates that the 8 percent profit factor is of more importance dollarwise than the 20 percent factor until cost underruns approach 40 percent at which point the two factors take on equal weight. It is only at this point, which we think is unrealistic, where real incentive to produce at low cost begins to exist under such contracts. There is no such cost underrun here.

In our view, even in the light of petitioner's overall efficiency in

the performance of the contracts before us and the favorable consideration to be given it with respect to the application of the risk, contribution, and character of business factors, its rates are not commensurate with its performance of the B–47 and KC–97 contracts by the use of largely Government-furnished facilities, and the use of those rates in the incentive contracts under which by far its greatest profits were collected constitutes an unconscionable exploitation of the United States in its procurement of military necessities.

After consideration of the record as a whole, we have found as a fact that petitioner's profits for 1952 in the amount of $56,734,119 are unreasonable in the amount of $13 million, which latter amount is to be eliminated.

*An order will be entered in accordance herewith.*